UNITED STATES of America,
Plaintiff-Appellee,

v.

Ralph T. MILLER & Joan Miller,
Defendants,

In re Subpoena Duces Tecum of James
M. RUSS, Appellant.

No. 80–5912.

United States Court of Appeals,
Fifth Circuit.*
Unit B

Nov. 2, 1981.

* Former Fifth Circuit case, Section 9(1) of Public
Law 96–452—October 14, 1980.

James M. Russ, pro se.

Don E. Christopher, Asst. U. S. Atty., Orlando, Fla., M. Carr Ferguson, Asst. Atty. Gen., Michael L. Paup, Chief, Appellate Section, R. Russell Mather, Tax Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before HILL, FAY and ANDERSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

This case is an appeal from an order entered by the district court holding appellant Russ in contempt for failure to comply with a pretrial subpoena duces tecum issued on behalf of the government. Appellant Russ is an attorney and a member of the Florida Bar. He became involved in these proceedings in the normal course of his representation of Mr. and Mrs. Ralph T. Miller, who are the defendants in a criminal tax fraud case presently pending for trial in the district court.[1] The criminal case involves charges against the Millers for income tax evasion for the years 1973, 1974 and 1975, in violation of 26 U.S.C.A. § 7201. The Millers operated a pawn shop as an unincorporated sole proprietorship. The subpoena at issue was issued pursuant to Fed.R.Crim.P. 17(c) and commanded appellant Russ to appear and to produce:

two income ledger books for the years of 1974 and 1975 for the OK Pawn Shop, Daytona Beach, Florida, which books were previously given to agents of the Internal Revenue Service on October 26, 1976, by Charles Kleinschmidt, CPA on behalf of Ralph and Joan Miller, and which books were returned by agents of the Internal Revenue Service on March 28, 1978 to Marshall Barkin, attorney for the Millers.

(R. 414.) On appeal appellant justifies his refusal to comply with the subpoena based upon his assertion that compliance would violate the attorney-client privilege and his clients' constitutional privilege against self-incrimination guaranteed by the Fifth Amendment. Upon appellant's refusal to comply, appellant was found to be in contempt, and fined $100 per day. Contemplating an appeal, the district court stayed imposition of the fine until ten days from the date of the decision of this court on appeal. Appellant filed a timely appeal.

## I. FACTS AND POSTURE OF THE CASE

The background facts can be briefly stated. The Internal Revenue Service investigation of the Millers' tax returns for the years 1973, 1974, and 1975 was conducted during 1975 and 1976. Although the audit was conducted as a civil audit, the revenue agent referred the investigation with respect to the 1973 return to the Intelligence Division[2] on April 15, 1975. The Intelligence Division has responsibility for criminal tax investigations. Similarly, the 1974 return was referred to Intelligence on January 15, 1976. On both occasions, the Intelligence Division rejected the referral. In each case the revenue agent followed the Internal Revenue Manual which requires the agent to suspend his examination and refer the case to the Intelligence Division when he discovers "a firm indication of

---

1. The record shows that appellant Russ' representation of his clients has been effective and commendable in every respect.

2. The Intelligence Division has now been renamed the Criminal Investigation Division.

fraud on the part of the taxpayer."[3] In each case, the agent complied with the requirement that the civil examination be suspended during the time a referral was pending before the Intelligence Division; accordingly, the revenue agent made no contacts with the taxpayers or their representatives during that time. In each case the civil audit was resumed when Intelligence rejected the referral. The Millers retained an attorney, Marshall Barkin, who in turn retained a certified public accountant on August 27, 1976, to assist him in his legal representation of the Millers. The ledger books at issue were delivered by Barkin to the accountant.

In October 1976, the Millers received a written demand from the revenue agent that they produce the two ledger books at issue; on October 26, 1976, the accountant turned over the two books to the revenue agent. The Service conducted handwriting and ink analyses of the ledgers and made photocopies of the ledgers. Upon demand by the Millers' attorney, the Service returned the original books but kept the copies. On October 28, 1976, the revenue agent again referred the Millers' tax returns for

1973, 1974 and 1975 to the Intelligence Division. This time the referral was accepted. Again following the Internal Revenue Manual, the revenue agent made no further contacts until February 18, 1977, when the revenue agent and a special agent[4] visited the pawn shop, advised the Millers that they were under investigation for possible criminal violations of the tax laws, and advised them of their constitutional rights under the Fifth Amendment and their right to legal counsel.

Neither the taxpayers nor their representatives were advised of the suspected criminal overtones at the time of any of the three referrals to Intelligence. They were not advised until February 18, 1977. However, neither the taxpayers nor their representatives ever asked whether the investigation had criminal overtones.

█ In due course the Millers were indicted, the Rule 17(c) subpoena was issued, appellant Russ' refusal to comply after having been ordered to do so resulted in the contempt order, and the instant appeal was filed.[5] The only significant issue[6] before us

---

**3.** Defendant's Exhibit "T" contains the pertinent portion of the Internal Revenue Manual. The referral directive is found in Part (10)91(1) of that exhibit.

**4.** The term "special agent" is used to describe an agent who works in the Intelligence Division.

**5.** Prior to the issuance of the subpoena in this case, the grand jury, investigating the Millers for alleged income tax evasion, issued a subpoena for the same ledgers. Appellant Russ filed a motion to quash on behalf of the Millers. A hearing was held on the motion; but before the district court could rule on the motion the prosecutor and IRS agent obtained a search warrant for Russ' office and seized the ledgers. During the search, the agents searched through files and documents of a personal and private nature relating to Mr. Russ and his clients. The district court properly ordered the ledgers returned, reasoning that the search warrant was unreasonable and that the search and seizure interfered with the Millers' Sixth Amendment right to effective assistance of counsel. While the issue is not before us, we do express our shock at this apparent circumvention of the then pending judicial process and intrusion upon the attorney-client relationship. The district court ruled that the evidence sought here

was not the fruit of that illegal search, and appellant has made no argument to the contrary, either in the court below or on appeal.

**6.** Appellant Russ also argues that the government has improperly used the Rule 17(c) subpoena as a discovery device. We find no merit in this argument. The Supreme Court, in *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), recognized that a Rule 17(c) subpoena was not intended as a tool for discovery, but rather was intended to expedite trials by providing a time and place before trial for inspection of subpoenaed materials. The Supreme Court adopted a four-part test, under which the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by the exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition." The Supreme Court also recognized that enforcement of such subpoenas was committed to the sound discretion of the trial court. We are satisfied that the instant subpoena is well with-

is whether the district court erred in rejecting appellant's reliance—in refusing to produce two ledger books—upon the attorney-client privilege, including the protection afforded by the attorney-client privilege to preexisting documents turned over to the attorney to obtain legal advice, when the documents would have been privileged in the hands of the client by reason of the Fifth Amendment. *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). We hold that attorney Russ had no attorney-client privilege with respect to the books, and therefore we affirm.

## II. ATTORNEY–CLIENT PRIVILEGE AND THE FIFTH AMENDMENT

All parties agree on one basic legal proposition, *i. e.*, that if a document would have been protected in the client's hands by reason of the Fifth Amendment, then the attorney-client privilege protects the document assuming it otherwise qualifies as confidential information delivered to the attorney in order to obtain legal advice. *Fisher v. United States, supra*, so held. Otherwise, a client would be reluctant to turn over possession to an attorney, and the ability to obtain legal advice would be diminished.

## III. DOES FISHER v. UNITED STATES PERMIT ONLY A NARROW FOCUS ON THE ACT OF PRODUCING A DOCUMENT

Before discussing the crucial attorney-client privilege issue, we consider and reject the government's argument that the Supreme Court in *Fisher* confined the Fifth Amendment's application to documents to a single, narrow approach. The government argues that *Fisher* permits only a single analysis, namely, a focus on the act of producing a document, so that the content of a document is no longer relevant. In *Fisher* the Court did analyze the act of producing. The Court said that the act of producing

documents: (1) acknowledged the existence of the documents; (2) acknowledged taxpayer's possession and control of the documents; and (3) indicated the taxpayer's belief that the documents were the ones described in the subpoena. Without deciding whether the implicit admission of the first two aspects—the existence and possession of documents—might rise to the level of testimony within the protection of the Fifth Amendment, the Court held the existence and location of the accountant's work papers at issue there was a "foregone conclusion," that taxpayer's implicit admission would add nothing, and therefore that no constitutional rights were touched. 425 U.S. at 411, 96 S.Ct. at 1581. With respect to the third or authentication aspect, the Court found no substantial threat of self-incrimination because the documents at issue were accountant's work papers which the taxpayer could not authenticate in any event.

Applying this analysis, the government notes that the two ledger books at issue here were previously turned over to the Internal Revenue Service, that authentication by the agents is a "foregone conclusion" without the necessity of any admission by the Millers or their attorney, and that the existence and location of the books are likewise a "foregone conclusion." Therefore, the government argues there is no Fifth Amendment shield with respect to these books in the Millers' hands, and accordingly none in the hands of their attorney.

We assume arguendo that the authentication of the books, and their location and existence, is a "foregone conclusion," and accordingly that the testimonial aspects of the act of producing the books does not present a substantial threat of self-incrimination. In this regard, the government persuasively suggests that the facts of the instant case are more favorable to the government than *Fisher*. However, the government argument glosses over the fact

in the above-stated four-part test, and that the district court did not abuse its discretion in

enforcing the instant subpoena.

that the *Fisher* court expressly did not address the question as to whether the taxpayer there could have been required to produce his own tax records or "private papers." The Court said:

> Whether the Fifth Amendment would shield the taxpayer from producing his own tax records in his possession is a question not involved here; for the papers demanded here are not his "private papers," see *Boyd v. United States,* 116 U.S. [616], at 634–635 [6 S.Ct. 524, at 534–535, 29 L.Ed. 746] [(1886)] . . . .

425 U.S. at 414, 96 S.Ct. at 1582. The Supreme Court did not overrule *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886) nor can we. This court has only recently held that *Boyd* is alive, and that the framework for analysis of the Fifth Amendment protection against production of documents has two prongs: *i. e.,* the *Fisher* analysis of the act of producing the documents, *and* the *Boyd* protection of private papers. *United States v. Davis,* 636 F.2d 1028 (5th Cir. 1981). The *Davis* panel read the previous decisions of this court as rejecting the government's argument that *Boyd* has been overruled. *See In re Oswalt,* 607 F.2d 645 (5th Cir. 1979); *In re Grand Jury Proceedings (McCloy and Sussman),* 601 F.2d 162 (5th Cir. 1979); *United States v. Hankins,* 565 F.2d 1344 (5th Cir. 1978) *clarified* 581 F.2d 431, *cert. denied* 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979). Accordingly, we reject the government's argument that *Fisher* permits, in analyzing the Fifth Amendment's application to the production of private papers, only a narrow focus on the act of producing.

## IV. *ATTORNEY–CLIENT PRIVILEGE*

Having rejected the government's argument based on *Fisher,* we turn to the crucial attorney-client privilege issue. The government argues that the books at issue were no longer confidential because the books were voluntarily turned over to the Internal Revenue Service on October 26, 1976, and because the government now has photocopies thereof.

There is no dispute that a valid attorney-client privilege is a prerequisite to appellant's challenge to the subpoena. In *United States v. Davis, supra,* we held that in order for an attorney to raise the privilege against self-incrimination on a client's behalf "the information in the documents must be confidential and the transfer [from client to attorney] must have been made to obtain legal advice." 636 F.2d at 1040. In the instant case, the government does not suggest that the transfer to appellant was for any reason other than to obtain legal advice. Accordingly, that element is not in issue. The only issue before us relating to the attorney-client privilege is whether or not the two books remain confidential, notwithstanding their previous delivery to the Internal Revenue Service.[7]

A. *Does the Previous Delivery Strip the Document of its Confidentiality Within the Meaning of the Attorney-Client Privilege?*

■ We first address whether or not the previous delivery would, as a general rule, strip the books of their confidentiality. In *United States v. Pipkins,* 528 F.2d 559, 563 (5th Cir.), *cert. denied,* 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976), this court held that Pipkins' voluntary disclosure of his handwriting style to the government stripped his subsequent handwriting sam-

---

7. Much of the argument in the briefs and at oral argument has been directed to the issue of whether the previous voluntary disclosure of the books to the revenue agent and the resulting fact that the Service has in its possession photocopies of the books, has stripped the books of any testimonial aspect of Fifth Amendment significance. In other words, would production of the books now constitute merely the production of paper and ink, rather than production of the testimonial aspect of the content of the books, and if so, would any Fifth Amendment protection against self-incrimination have been dissipated? Following the time-honored principle that courts will decline to reach constitutional issues if the case can be decided on nonconstitutional grounds, *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., dissenting in part), we decline to reach this Fifth Amendment issue in the instant case.

ples of their confidential nature within the meaning of the attorney-client privilege. Pipkins had voluntarily given his handwriting sample to the postal inspector assigned to investigate the theft and forgery of a government check. After his indictment, Pipkins' attorney employed a handwriting expert who examined the forged check, the handwriting exemplars which Pipkins had previously given the government agent, and new handwriting samples which Pipkins provided at the request of the expert. The expert's report was adverse, and accordingly Pipkins did not call the expert as a witness for the defense. The prosecution's use of the expert was allowed by the district court over the defense objection based on the attorney-client privilege. Noting that one's style of handwriting is not intrinsically confidential, and that any hope of confidentiality was lost by the previous disclosure of his handwriting style to the government, this court held that Pipkins had failed to establish that his handwriting samples were confidential communications within the meaning of the attorney-client privilege. *Accord United States v. Franklin*, 598 F.2d 954, 957 (5th Cir.), *cert. denied*, 444 U.S. 870, 100 S.Ct. 147, 62 L.Ed.2d 95 (1979). To the same effect, *McCormick on Evidence*, § 93 (2d Ed. 1972), in a discussion of the attorney-client privilege, provides:

> When at an earlier trial or stage of the case the privilege has been waived and testimony as to the privileged communications elicited without objection, the prevailing view is that this is a waiver also for any subsequent hearing of the same case. In the words of Holmes, J., "The privacy for the sake of which the privilege was created was gone by the appellant's own consent, and the privilege does not remain in such circumstances for the mere sake of giving the client an additional weapon to use or not at his choice." The same reasons seem to apply where the waiver was thus publicly made up on the trial of one case, and the privilege later sought to be asserted on the hearing of another cause. How far does this argument of once published, permanently waived, apply to out-of-court disclosures

made by the client or with his consent? Authority is scanty, but it seems that if the client makes public disclosure, this should clearly be a waiver, and even where privately revealed to a third person, or authorized to be revealed it should have the same effect, by analogy to the cases which deny privilege when a third person is present at the consultation.

(Footnotes omitted). *Accord* 8 Wigmore, *Evidence* § 2328 (McNaughton rev. 1961). On the basis of the foregoing authorities, we conclude that the previous voluntary disclosure to the Internal Revenue Service of the two ledger books at issue here would strip the books of their confidential nature and thus defeat the attorney-client privilege.

However, we must address two arguments made by appellant which challenge the voluntary nature of the previous delivery of the books to the Internal Revenue Service. First, appellant argues that the accountant's delivery of the books to the revenue agent was procured by misrepresentation, deceit and fraud on the part of the agent. Second, appellant argues that the accountant lacked authority to turn over the books.

B. *Did Misrepresentation, Deceit and Fraud on the Part of the Internal Revenue Service Taint the Previous Delivery?*

Appellant's misrepresentation argument relies upon *Stuart v. United States*, 416 F.2d 459 (5th Cir. 1969), and *United States v. Tweel*, 550 F.2d 297 (5th Cir. 1977). These cases involved allegations of misrepresentation and deception in Fourth or Fifth Amendment contexts. However, the situations are similar, and the same principles apply to the instant case involving the attorney-client privilege. In *Stuart*, the taxpayer worked at night and slept during the day. For the convenience of the revenue agent, the taxpayer turned over custody of her tax records to an accountant, at whose office the agent could more conveniently conduct the investigation. After discovering possible indications of fraud,

the Internal Revenue Service issued a subpoena to compel the accountant to produce the taxpayer's records. The government conceded that, had the taxpayer retained possession of the records, she could have successfully asserted her Fifth Amendment privilege against self-incrimination. This court refused to enforce the subpoena, because the taxpayer had delivered the records to the accountant for the convenience of the government, thus indicating that the government had a significant role in the transfer.

In *Tweel*, the taxpayer's accountant turned over to a revenue agent certain of taxpayer's tax records, which were copied by the agent. The taxpayer's conviction for tax evasion was reversed by this court on the ground that the district court erroneously denied taxpayer's motion to suppress the copies. We held that the accountant's consent to the search, by turning over the taxpayer's records, was obtained by the government by misrepresentation and deception, that therefore the search was unreasonable, in violation of the Fourth Amendment, and that the evidence derived from the search should have been suppressed. Deceit and misrepresentation were present because the taxpayer's accountant specifically asked whether a "special agent" was involved, and received a negative answer despite the fact that the revenue agent knew at the time that the accountant's question was asked to ascertain whether the audit was criminal in nature, and despite the fact that the agent knew at the time that the audit was being conducted at the specific request of the Organized Crime and Racketeering Section of the Department of Justice. The audit undeniably was a criminal investigation.

We agree with the government that the instant case is distinguishable from both *Stuart* and *Tweel*, and instead is controlled by *United States v. Prudden*, 424 F.2d 1021 (5th Cir. 1970), *cert. denied* 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970), and its progeny. *Tweel* itself cited *Prudden* and its progeny and specifically acknowledged that the party asserting fraud on the part of the government had the burden of proving some affirmative misrepresentation by clear and convincing evidence, and that silence can be equated with fraud only where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading. The *Tweel* panel found that the silent misrepresentation there was intentionally misleading and material. 550 F.2d at 299.

In *Prudden*, the taxpayer turned over documents to a revenue agent during the course of a civil audit, and later, after being indicted for tax evasion, the taxpayer moved to suppress the documents, asserting violations of his Fourth, Fifth, and Sixth Amendment rights. For purposes of the instant case, the relevant *Prudden* facts were that the revenue agent did not advise the taxpayer when the investigation was referred to the Intelligence Division, and that the agent continued contacts with the taxpayer even after referral. Finding the district court's ultimate finding of fraud, deceit and trickery to be clearly erroneous, we held:

> [T]hat the mere failure of a revenue agent (be he regular or special) to warn the taxpayer that the investigation may result in criminal charges, absent any acts by the agent which materially misrepresent the nature of the inquiry, do (sic) not constitute fraud, deceit and trickery. Therefore, the record here must disclose some affirmative misrepresentation to establish the existence of fraud, and this showing must be clear and convincing.

424 F.2d at 1033.

In *United States v. Ponder*, 444 F.2d 816 (5th Cir. 1971), the taxpayer's records were turned over to the Internal Revenue Service during the course of a civil audit. The taxpayer was later indicted and sought to suppress the records on the basis of the Fourth and Fifth Amendments. The court assumed that the criminal phase of the investigation began after the records were in the hands of the Internal Revenue Service, but before the copies were made. Rejecting the taxpayer's argument that the Service was under a duty to advise of the

change in status to that of a criminal case, and relying upon *United States v. Prudden, supra,* and *United States v. Tonahill,* 430 F.2d 1042 (5th Cir. 1970), *cert. denied,* 400 U.S. 943, 91 S.Ct. 242, 27 L.Ed.2d 247, this court held:

> *Prudden* and *Tonahill* hold that evidence received from the taxpayer after the criminal investigation commenced is admissible, even though no notice or *Miranda* warnings were given. *A fortiori* the evidence received from Ponder before the criminal investigation commenced is not rendered inadmissible merely because it was copied thereafter.
>
> These cases recognize that evidence obtained for criminal use by deceit, fraud and misrepresentation might be suppressed, but held that failure to advise the taxpayer that a criminal investigation was being made did not amount to such conduct.

444 F.2d at 819.

In the instant case, appellant asserts as evidence of misrepresentation or deception only that the revenue agents did not advise taxpayers or their representatives when the investigation was referred to Intelligence. The record here affirmatively shows that neither the taxpayers nor their representatives ever asked any questions relating to whether the audits were civil or criminal. We conclude that the facts here are more favorable to the government than those in *Prudden* and *Ponder* and accordingly those cases are controlling. There is no evidence in this record that the selection of these returns for audit had criminal overtones,[8] as in *Tweel.* Nor did the taxpayers here or their agents ask if the audit had criminal overtones, as had been done in *Tweel.* We conclude that *Tweel* is inapposite. Nor is there any evidence that the books at issue were turned over to the agent as an accommodation or convenience to the agent; thus, we find *Stuart* inapposite. Accordingly, we hold that appellant has failed to carry his burden of proving that the government was guilty of misrepresentation, deception or fraud in connection with the transfer of the documents from taxpayer's accountant to the Service.

## C. Did the Accountant Lack Authority to make the Previous Delivery?

Appellant also argues that the accountant did not have authority to turn the books at issue over to the revenue agent, and therefore that such previous disclosure cannot form the basis of a holding that the attorney-client privilege was waived. Acknowledging that the district court found that the previous disclosure by the accountant was voluntary, appellant argues that a waiver of the privilege against self-incrimination must be knowing and intelligent, *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1937), and that the government has the burden of proof with respect thereto. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Appellant combines this burden of proof argument with an assertion that the record does not support a finding that the government satisfied its burden; appellant concludes that the district court's finding was erroneous. We reject appellant's argument. The cases cited by appellant to support a shift of the burden of proof to the government are Fifth Amendment cases, not attorney-client privilege cases.[9] With respect to the attorney-client privilege, it is well established that appellant, the party asserting the privilege, has the burden of proof. *Weinstein's Evidence,* ¶ 503(a)(1)[01].

---

8. In fact the record here affirmatively demonstrates that the returns were routinely selected for audit.

9. *Cf. United States v. Ponder,* 444 F.2d 816, 819 (5th Cir. 1971), refusing to suppress on Fourth and Fifth Amendment grounds copies of business and financial records which had been made by the Internal Revenue Service from originals which had been voluntarily turned over during a civil audit. The court said, "The Fifth Amendment ... protects against compulsion and not voluntary acts, and must be asserted by refusing to deliver records in a case such as this." 444 F.2d at 819.

■ At oral argument, appellant argued that the issue of the suppression of these books was not properly before the district court in its hearing on August 22 and 27, 1980, perhaps attempting to excuse his own failure to introduce evidence to satisfy his burden of proving that the accountant lacked authority to turn over the books. Appellant argues that there were two motions to suppress pending just before the hearing, taxpayers' August 8, 1980, Motion to Suppress Defendants' Statements and Records, and taxpayers' August 6, 1980, Motion to Suppress Statements and Acts of Defendants' Attorney and Accountant, that the suppression of the books was at issue only in the latter motion, and that the latter motion was deferred by the district court's order of August 21, 1980. We reject appellant's argument for several reasons. First, the August 8, 1980, motion, which even the accountant concedes was the subject of the hearing,[10] specifically referred to the two books at issue as having been turned over by the taxpayers' accountant to the revenue agent on October 26, 1976 (R. 289) and specifically sought as relief: "[a]n order . . . suppressing . . . any records turned over to any government agents prior to February 17, 1977; and [a]n order . . . suppressing as evidence any fruits, leads, and derivative evidence . . . developed from the statements and/or records obtained from the defendants and their attorney and accountant prior to February 17, 1977." (R. 294) Second, the district court's August 21, 1980, order, which appellant relies on as establishing that consideration of the two books was deferred, expressly held that *all* pending motions would be heard at 8 a. m., August 22, 1980, "except the Motion to Suppress *Statements* of Marshall Barkin [the attorney] and Charles Kleinschmidt [the accountant] and Bill Lewis [associate of the accountant] . . . the motion to suppress *statements* will be heard during the course of the trial if and when such statements are offered." (R. 317, emphasis added). The

only exception related to *statements* of taxpayers' attorney and accountant. Moreover, the expressed reason for deferring consideration of the statements precludes any misunderstanding that consideration was also being deferred on the two books, which the government was seeking in order to conduct pretrial tests. We conclude that it was clearly contemplated that the issue of the production of the two books would be heard at the hearing conducted on August 22, 1980, and continued to August 27, 1980.

■ Also at oral argument, appellant argued that there was no evidence in the record to support the implicit finding of the court below that the accountant had authority to turn over the books. We reject this argument for three reasons. First, appellant, as the party asserting the attorney-client privilege, had the burden of proving that the privilege applies. If there were a failure of proof, appellant's assertion of the privilege would fail. Second, the district court relied in part on the proceedings in a related case, Subpoena Duces Tecum of James M. Russ, Attorney for Ralph T. Miller and Joan Miller, Case No. 80–47–Orl–Misc–R (Middle District of Florida, April 11, 1980), where Judge Reed, after an extensive hearing, concluded that the books had been voluntarily turned over. Those proceedings were incorporated into the record below at appellant's request. Appellant has failed to include those proceedings as part of the record on appeal, and accordingly we cannot say that there is no evidence to support the finding. Third, the record on appeal does contain the power of attorney executed by the taxpayers. That power of attorney "appoints [both the attorney and the accountant] as attorney(s) in-fact to represent the taxpayer(s) before any office of the Internal Revenue Service with respect to the following Internal Revenue tax matters . . .: income tax liabilities for calendar years 1973, 1974, and 1975." (R. 275, exhibit C). The record before us also dis-

---

**10.** The purpose of the hearing was expressly to consider *all* pending motions, with only the one exception mentioned below in the text. The two books were put in issue for that hearing not only by the taxpayers' August 8, 1980, motion, but also by the government's pending motion to subpoena those books.

closes the fact that the accountant did, in fact, negotiate with the revenue agent on behalf of the taxpayers. In discussing whether disclosures made by an attorney waive a client's attorney-client privilege, Wigmore says:

> Since the attorney has implied authority from the client ... to make admissions and otherwise to act in all that concerns the management of the cause, all disclosures (oral or written) *voluntarily* made to the opposing party or to third persons in the course of negotiations for settlement, or in the course of taking adverse steps in litigation ... are receivable as being made under an implied waiver of privilege, giving authority to disclose the confidences when necessary in the opinion of the attorney. This is so unless it appears that the attorney has acted in bad faith toward the client.

8 Wigmore, *Evidence* § 2325 (McNaughton rev. 1961). Appellant's only proffer of evidence is an affidavit of the accountant stating that "without prior direct consent, permission or specific authorization of Mr. and Mrs. Miller, I presented to Internal Revenue Service ... two bound ledger books." (R. 415). This would not be sufficient to show that the accountant acted in bad faith or exceeded his implied authority to negotiate and make disclosures in the course thereof.

In summary, we hold that appellant has failed to carry his burden of establishing the applicability of an attorney-client privilege. In the absence of an attorney-client privilege, appellant cannot assert the Millers' Fifth Amendment privilege against self-incrimination. Thus, appellant's refusal to comply with the subpoena was not justified, and the district court's judgment of contempt was appropriate. For the foregoing reasons, we

AFFIRM.

FAY, Circuit Judge, dissenting:

Most respectfully, I dissent. Judge Anderson has written a detailed scholarly analysis of the facts and law surrounding the issues presented. In my opinion, however, the majority opinion has lost sight of the single most important question presented:

> Does the voluntary production of personal papers during a civil tax audit constitute an absolute unconditional waiver of all rights (including the Fifth Amendment) when criminal proceedings follow thereafter?

The government has copies of the two income ledger books. The information contained within those papers is available and usable in the criminal proceedings. But, that is not what is before us. What is presented to us is a court order requiring the production of the original documents because,

> "The attorney for the Government has determined that further handwriting and ink analysis is necessary in order to develop possible additional evidence for use at the trial of this case. In order for the Government scientists to perform such analyses, it is necessary that the original ledger books be made available to them for testing (R 223)."

To conclude that the previous voluntary disclosure of the two ledger books during a civil audit equates with the stripping from the books their confidential nature, *for all purposes*, and thus defeats the attorney-client privilege is too big a jump for me. The government could have conducted whatever tests it desired, but it did not. The taxpayers demanded the return of the two ledgers. The books (originals) were returned. The taxpayers then sought legal advice from Mr. Russ and turned the ledgers over to him. Mr. Russ is raising the taxpayers' rights under the Fifth Amendment. I would uphold his right to do so.

The "testimonial aspect" of producing documents surely covers more than mere authentication. These are private personal papers. *Boyd* is alive! To suggest, as the majority opinion does in footnote 7, that this case can be decided without reaching the Fifth Amendment issue, is to ignore the very guts of the only question presented. The appellant refused to produce the ledgers upon the grounds that such an act would violate his clients' constitutional priv-

ilege against self-incrimination guaranteed by the Fifth Amendment. Based upon the authorities cited, but not followed, by the majority, I would uphold that refusal.